IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAMES TAUNTON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CASE NO. 2:09-CV-883-WKW[WO] |
| v. | ) |
| | ) |
| GENPAK LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Before the court is Defendant GenPak, LLC's Motion for Summary Judgment, which is accompanied by a brief and evidence.  (Docs. # 19-20.)  Plaintiffs James Taunton and Arthur C. Malone Jr. filed a Response (Doc. # 23), to which GenPak filed a Reply (Doc. # 31).  In this action, Plaintiffs seek overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1).  The sole issue is whether § 207(a) requires overtime compensation for the hours Plaintiffs spend "on call" away from their place of employment, but not called in to work.  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that there are no genuine issues of material fact and that, as a matter of law, Plaintiffs are not entitled to overtime compensation for those on-call hours.  GenPak's Motion for Summary Judgment, therefore, is due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its

claims for relief exists.  Fed. R. Civ. P. 56(e)(2); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (citation and internal quotation marks omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to

oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment.").  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

## IV.  FACTS AND PROCEDURAL HISTORY

Viewed in the light most favorable to Plaintiffs, with all reasonable inferences drawn in Plaintiffs' favor, the facts are as follows.  Defendant GenPak LLC ("GenPak"), a plastics manufacturer, operates two plants in Alabama, one in Montgomery and one in Hope Hull. (James Hughes Aff. ¶ 1.)  Plaintiffs James Taunton ("Taunton") and Arthur C. Malone ("Malone") are Class A maintenance employees, who have worked at the Hope Hull plant since 2002.[1]  They are paid on an hourly basis.  (Taunton Dep. 28-29, 39, 31-32; Malone Jr. Dep. 7-8, 12, 14.)  The Class A maintenance employees' regular shift hours are 6:00 a.m. to 3:00 p.m., Monday through Friday.  (Hudson Aff. ¶ 3; Taunton Dep. 104; Malone Dep. 46-47.)

---

[1] Mr. Taunton first worked for GenPak in 1998; he returned in 2001 to the Montgomery plant. (Taunton Dep. 22, 28-29.)  He went to the Hope Hull plant in 2002.  (Taunton Dep. 31-32.)  Mr. Malone's employment with GenPak commenced in 2002; he was at the Montgomery plant for two weeks, and then moved to the Hope Hull plant.  (Malone Dep. 12, 14.)

In addition to their regular shift work, Class A maintenance employees participate in an on-call rotation to address maintenance issues that arise during the night shift or the weekend. (Hudson Aff. ¶ 4.) GenPak has an undated, written Call In Policy. It requires the on-call employee to monitor "at all times" an operable pager, and to return a page within an hour. (GenPak Call In Policy 1 (Ex. B-1 to Hudson Aff.).) The policy also sets forth the manner in which on-call employees are paid for call ins, discussed below, and that violations of the policy will result in the "disciplinary ladder [being] followed." (GenPak Call In Policy 1.)

At all times relevant to this lawsuit, the on-call rotation policy about which Plaintiffs complain has operated as follows.[2] Class A maintenance employees are required to be on call on a rotating basis for seven consecutive days at a time.[3] The time span between a Class A Maintenance employee's on-call assignment depends upon the number of Class A Maintenance workers employed. When this lawsuit was filed, there were five Class A Maintenance employees; currently there are four. (Hudson Aff. ¶ 4.) Plaintiffs, thus, have served on call every fourth or fifth week.

While on call, the employee wears a pager issued by GenPak. If there is a maintenance problem during the night shift or on the weekend, the supervisor on duty

---

[2] According to Plaintiffs, the on-call policy was more lenient when they first starting working at the Hope Hull plant. (Malone Dep. 16, 18; Taunton Dep. 35-38.) At some point, the requirements evolved into those at the heart of this controversy.

[3] The on-call Class A maintenance employee would leave the plant at the end of the regular shift at 3:00 p.m. "regardless of what problems [were] occurring or what [was] still ongoing at the time." (Hudson Aff. ¶ 4.) The employee, however, would be on call until the shift started the next morning at 6:00 a.m., and through the weekend.

typically will contact Maintenance Manager James Hughes ("Hughes") or the lead maintenance supervisor to discuss the problem. If it is determined that a repair is needed, the maintenance employee on call is telephoned or paged. (Hughes Aff. ¶ 4.) The on-call employee has one hour to return a page. When the employee calls in, there is further discussion about whether he actually needs to report to the plant. (Hughes Aff. ¶¶ 4-9; Hudson Aff. ¶¶ 4-5; Taunton Dep. 44, 52, 69-70; Malone Dep. 18, 20.) If the on-call employee is needed onsite, he has an hour and a half from the time he is paged to report to work.[4] For example, if an on-call employee is paged at 9:00 p.m., he has until 10:00 p.m. to return the page, and until 10:30 p.m. to report to the plant, if necessary.

The on-call Class A maintenance workers are not compensated for the time spent on call unless they are called in to the plant. If the on-call employee is required to report to the plant, he is compensated for a minimum of four hours at his overtime rate, even if he actually works less than four hours. If the time at work exceeds four hours, the employee is paid for

---

[4] GenPak's written Call In Policy does not address how long an on-call employee has to report to the plant, and there is some discrepancy in the testimony with respect to this issue. Mr. Malone testified that, from the time he returned a page, he had an hour and a half to report to the plant, if he was needed onsite. (Malone Dep. 39, 58-60.) For example, according to Mr. Malone's testimony, if he were paged at 9:00 p.m. and called in at 10:00 p.m., he would have until 11:30 p.m. to arrive at the plant. Mr. Taunton, however, testified that GenPak only gives on-call employees "an hour and a half to get [to the plant] . . . from the time [the employee is] called." (Taunton Dep. 113-14.) Hence, in this scenario, if Mr. Taunton received a page at 9:00 p.m. and called in at 10:00 p.m., he only would have until 10:30 p.m. to report to the plant. Maintenance Manager James Hughes does not give a fixed time within which an on-call employee must report to the plant. He says that, if after the page is returned and it is decided that the employee needs to "com[e] in, ample time is given to the employee to arrive at the plant." (Hughes Aff. ¶¶ 6, 8.) Four hours, however, would not be an "acceptable response time." (Hughes Aff. ¶ 10.) For summary judgment purposes, it will be assumed that the reporting time is, as Mr. Taunton testified, an hour and a half from the time the employee is paged because this testimony provides the most restrictive response time.

all hours actually worked at the overtime rate of pay.  (Hudson Aff. ¶ 9; Taunton Dep. 47; Malone Dep. 22.)

Employees are allowed to switch their on-call times, subject to approval by Mr. Hughes.  (Hughes Aff. ¶¶ 1, 7; Hudson Aff. ¶ 6; Taunton Dep. 49-50.)  It is "extremely rare" for Mr. Hughes to disapprove a switch in on-call duties.  (Hughes Aff. ¶ 7.)  A request has been denied only once, when Mr. Hughes believed that an employee who wanted to switch with Mr. Malone for a day "was trying to get extra hours."  (Hughes Aff. ¶ 7; Malone Dep. 27-28.)  Mr. Malone did not try to arrange a switch with a different employee after Mr. Hughes denied the initial request.  (Malone Dep. 28.)  Except for this one time, Mr. Malone has requested to switch on-call duties "[a] day here or a day there," and has been given permission to do so.  (Malone Dep. 26.)  Also, Mr. Taunton acknowledges that, if he has a conflict during his scheduled on-call rotation, he can switch rotations, subject to Mr. Hughes's approval, and as long as he could "get somebody to swap." (Taunton Dep. 49-50.) He recalls that other employees have swapped rotations, but he does not "recall ever . . . switching with anyone." (Taunton Dep. 50.)  Supervisors also are available to cover on-call time if necessary.  (Hughes Aff. ¶ 7.)  Also, if an employee is scheduled to be on vacation during his on-call week, the next person on the list covers that week, and the rotation continues.  (Taunton Dep. 97.)

Because the on-call employees wear pagers, there is no requirement that they remain in their homes while on call.  (Taunton Dep. 52-53.)  In other words, they do not have to sit

7

by a telephone while on call.[5]  (Malone Dep. 58.)  On-call Class A maintenance employees

may engage in personal activities so long as they return the call or page within an hour to

discuss arrangements for possibly coming in to the plant, and are available to report to the

plant within an hour and a half of receiving the page.  (Hudson Aff. ¶¶ 4-9; Hughes Aff. ¶ 8;

Taunton Dep 66-67, 58-60.)

When he is on call and wears a pager, Mr. Taunton can watch television, go on

personal errands, entertain people in his home, and eat out.  (Taunton Dep. 44, 66-67;

Hughes Aff. ¶ 15.)  Mr. Taunton also has been fishing while on call, but before leaving home

to fish, he would "[c]all the supervisor . . . and make sure that everything was running good."

(Taunton Dep. 67.)  He, however, has stopped fishing while on call.  (Taunton Dep. 116.)

Also, if he "want[s] a beer" while on call, he has "to think about it."  (Taunton Dep. 116.)

Mr. Malone also can engage in personal activities, such as grocery shopping or going

to a friend's house, while on call.  (Malone Dep. 59.)  He, however, "can't really get

involved in any" activity that will take longer than the time necessary to report to the plant.

(Malone Dep. 60.)  Also, Mr. Malone complains that one evening when he was on call, he

was required to report to work, notwithstanding that he told Mr. Hughes that he "had been

drinking" and "had had quite a few."  (Malone Dep. 61.)

---

[5] Mr. Hughes on occasion has told Mr. Malone to "sit by the phone," but Mr. Malone acknowledges that the phrase "sit by the phone" is a figure of speech not to be taken literally, but rather amounts to a heads up that he might be needed while on call.  (Malone Dep. 56.)  Mr. Malone makes no claim in this lawsuit that he was required literally to sit by the telephone when on call.  (Malone Dep. 56.)

Plaintiffs have spent a fraction of their on-call duties engaged in actual work at the plant. Mr. Taunton reported to the plant for on-call work thirty-one times in three years, and Mr. Malone came in seventeen times in three years. (Hughes Aff. ¶ 10; GenPak Payroll Records (Ex. B-5 to Hudson Aff.).) The number of times each year for the years 2007-2009 that Plaintiffs were called in is as follows (*see* Hudson Aff. ¶ 10):

|  | Taunton | Malone |
|---|---|---|
| 2007 | 10 times | 6 times |
| 2008 | 13 times | 7 times |
| 2009 | 8 times | 5 times[6] |

The total number of hours actually worked by Plaintiffs at the plant while on call, broken down by year, is as follows (*see* GenPak Payroll Records):

|  | Taunton | Malone |
|---|---|---|
| 2007 | 15.3 hours | 11.67 hours |
| 2008 | 17.75 hours | 12.67 hours |
| 2009 | 4.45 hours | 12.52 hours |

Over this three-year span, Mr. Taunton worked an average of 1.21 hours each time he was called in, while Mr. Malone averaged 2.05 hours of actual work per call in. Mr. Taunton was called in three times for periods of time exceeding, but not by much, four hours, and Mr. Malone's on-call work exceeded four hours on three occasions. Thirteen out of the

---

[6] GenPak's payroll records reflect that Mr. Malone was called in five times in 2009, as depicted above. (GenPak Payroll Records (Ex. B-5 to Hudson Aff.).) This calculation is different from Ms. Hudson's affidavit in which she says that Mr. Malone was called in four times in 2009. (Hudson Aff. ¶ 10.)

thirty-one times that Mr. Taunton was called in, he clocked in for less than an hour, and seven of the eighteen times that Mr. Malone was called in, he clocked in for less than seventy minutes.

Plaintiffs are the only Class A maintenance employees who have been reprimanded for violating the on-call policy – Mr. Taunton twice and Mr. Malone once.  In April 2009, Mr. Taunton received a written warning for failing to respond when he was paged while on call.  (Reprimand (Ex. B-2 to Hudson Aff.).)  According to Mr. Taunton, he was taking medication and was asleep, and missed the page.  Later when he realized that he had been paged, he called in.  (Taunton Dep. 60, 63.)  After this reprimand, Mr. Taunton was told that, when he was on call, he had to be "readily available," meaning that he had "to be where he could call the plant within the hour" of being paged  (Taunton Dep. 53.)  To comply with the one-hour call-in rule, Mr. Taunton felt that he had to "put [his] life on hold."  (Taunton Dep. 55, 67.)  He could not go to "sleep at night" if he was taking medication for fear that he would not wake up if paged.  (Taunton Dep. 56-57.)  He believes that he should be paid for the entirety of the on-call assignment if GenPak "wants [him] to be on call 24/7."  (Taunton Dep. 65.)

In June 2009, Mr. Taunton received a written "final warning" because he did not call the plant within an hour of being contacted by GenPak.  (Hudson Aff. ¶ 13; Reprimand (Ex. B-3 to Hudson Aff.); Taunton Dep. 63.)  Again, Mr. Taunton was asleep and missed the telephone call, which occurred around 9:50 p.m., and if the pager went off, he did not hear it.  (Taunton Dep. 63-64.)  When he woke up at 1:30 a.m. and realized he had missed the call,

he telephoned his supervisor.  (Taunton Dep. 64.)  Neither reprimand affected Mr. Taunton's rate of pay nor permanent employee record.  (Hudson Aff. ¶ 13.)  All reprimands are removed from the personnel file after one year.  (Hudson Aff. ¶ 13.)

Mr. Malone received a written warning in April 2009 because when he returned a page, he indicated that it would take him four hours to get to the plant; he was told that he was not "readily available."  (Malone Dep. 31-35, 63.)  Four hours was not an "acceptable response time," as determined by Mr. Hughes.  (Hughes Aff. ¶ 10.)

Plaintiffs commenced this action by filing a one-count Complaint on September 16, 2009, with a jury demand, alleging that GenPak's practice of paying them overtime only for call ins, instead of for the entirety of the time they serve on call, violates the FLSA.  Plaintiffs request an award of unpaid overtime compensation, liquidated damages, and costs, to include attorney's fees.  (Compl. 5 (Doc. # 1).)   The filing and briefing of GenPak's summary judgment motion occurred in June and July 2010, following discovery.  A pretrial hearing was held on July 12, 2010.  The Order on Pretrial Hearing, entered on July 13, 2010, contains stipulations submitted by the parties.[7]  (Pretrial H'rg Order § 5 (Doc. # 30).)

## V.  DISCUSSION

---

[7] Those stipulations, which have been incorporated in this opinion, are as follows: (a) Plaintiffs are full-time maintenance employees for GenPak and are paid by the hour; (b) Plaintiffs participate in an on-call rotation and have been on call every four to five weeks over the last three years; (c) Plaintiffs are paid a minimum of four hours at the overtime rate of pay when called to work while serving on call; (d) Plaintiffs do not claim that any time worked at the plant has gone unpaid or has been improperly paid; (e) the sole issue in this case is whether Plaintiffs should be compensated for the time they are on call. (Pretrial H'rg Order § 5.)

The sole contested issue is whether the on-call hours spent by Plaintiffs in waiting constitutes working time within the overtime provision of the FLSA, 29 U.S.C. § 207(a)(1).[8] Overtime compensation with respect to the time Plaintiffs actually worked at the plant while on call is not at issue.  (Taunton Dep. 137-38; Malone Dep. 40.)  The on-call restrictions require that, during every fourth or fifth week when Plaintiffs are on call, they (1) contact GenPak within an hour of being paged, and (2) remain geographically situated so that, if needed onsite, they can report to GenPak within an hour and a half of receiving a page.

GenPak argues that, while on call, Plaintiffs are not severely restricted in their personal pursuits and that its on-call policy is "so liberal and flexible that no comparable case law exists."  (Def. Summ. J. Br. 18-19 (Doc. # 20).)  Thus, as argued by GenPak, Plaintiffs' on-call waiting time – *i.e.*, the time they spend on call but not actually working at the plant – is not compensable overtime under the FLSA.  (Def. Summ. J. Br. 18-19.)  Plaintiffs, on the other hand, contend that when on call, their "normal life" activities are restricted to a degree that those hours should be compensated, and that GenPak derives a free benefit when it obtains mechanical advice from Plaintiffs over the telephone, but does not require Plaintiffs to come to the plant.  (Pls. Summ. J. Resp. 2-3 (Doc. # 23).)

The FLSA was enacted in 1938 to "'guarantee either regular or overtime compensation for all actual work or employment.'"  *Dade County, Fla. v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir. 1997) (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*,

---

[8]  It is undisputed that the on-call time at issue, if compensable work under the FLSA, would be paid at an overtime rate.

321 U.S. 590, 597 (1944)).  Under the FLSA, employers must pay employees at an increased

rate of at least time and a half when their workweek exceeds forty hours:

> Except as otherwise provided in this section, no employer shall employ any of
> his employees . . . for a workweek longer than forty hours unless such
> employee receives compensation for his employment in excess of the hours
> above specified at a rate not less than one and one-half times the regular rate
> at which he is employed.

§ 207(a)(1).  Section 207(a)(1) does not define when on-call time is compensable as work

under the FLSA.  "By not providing a definition of 'work' or 'employment' in the FLSA,

Congress left it to the courts to determine which employment-related activities are

compensable under the Act."  *Alvarez*, 124 F.3d at 1384.  Early on, however, two Supreme

Court decisions interpreted § 207(a) in the context of on call compensation, and from those

decisions the "waiting to be engaged" doctrine has emerged.  *See Armour & Co. v. Wantock*,

323 U.S. 126 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  In *Armour* and

*Skidmore*, the plaintiffs were firefighters employed by private companies.  A component of

their jobs included being on call.

The *Armour* firefighters were on call for fifteen of every forty-eight hours.[9]  They

were paid a fixed weekly rate, regardless of the number of hours spent on regular or on-call

duty.  323 U.S. at 127-28.  When on call, they were required to remain on the company's

premises, except if they obtained permission to eat dinner at a nearby restaurant, "to respond

to any alarms, to make any temporary repairs of fire apparatus, and take care of the sprinkler

---

[9] The firefighters worked an 8:00 a.m. to 5:00 p.m. shift.  At 5:00 p.m, they were off the clock,
but remained on call for twenty-four hours to respond to fire alarms or to repair firefighting equipment.
*Armour*, 323 U.S. at 127.  The following twenty-four hours, the firefighters were "off duty entirely."  *Id.*

system if defective or set off by mischance." *Id.* at 127.  On average, while on call, the firefighters performed actual work less than a half hour a week.  *Id.*  To otherwise occupy the firefighters, the company provided a kitchen, beds, radios and facilities for recreational activities, such as card playing, and the firefighters could entertain themselves on the premises "pretty much as they chose."  *Id.* at 128.

The *Armour* Court did not create a bright-line test, but focused on "whether time is spent predominantly for the employer's benefit or for the employee's," a question which, it said, was "dependent upon all the circumstances of the case." 323 U.S. at 133.  The Supreme Court affirmed the judgment that the firefighters' on-call time spent on the company's premises, excluding time spent sleeping and eating, was work time compensable under the FLSA, in large part because the firefighters were not at liberty to leave the fire hall while remaining in a standby capacity.  *Id.* at 127-28, 129.

The facts in *Skidmore* share some similarities with those in *Armour*.  While on call for three and a half to four nights a week, the firefighters stayed in the company's fire hall, which had comfortable amenities, or "within hailing distance" of the fire hall.  *Skidmore*, 323 U.S. at 136.  But, as the *Skidmore* Court observed, the arrangement between the firefighters and the employer was not exactly like that in *Armour*.  In *Skidmore*, for example, time was compensated at an agreed rate for each alarm call.  *Id.* at 135-36.  The factual differences underscored that "[e]ach case must stand on its own facts." *Id.* at 140.  If the facts show that the employee was "engaged to wait," the time is compensable, but if the facts show that the employee was "wait[ing] to be engaged," the time is not compensable.  *Id.*

at 137.  "His compensation may cover both waiting and task, or only performance of the task itself," depending on the circumstances.  *Id.*  The Court declined to "lay down a legal formula to resolve cases," given the endless variation of situations in which employment involves "waiting time."[10]  *Id.* at 136.  "Whether in a concrete case such time falls within or without the [FLSA] is a question of fact to be resolved by appropriate findings of the trial court."[11]  *Id.*  In *Skidmore*, the judgment was reversed for further proceedings because the lower courts erroneously had concluded that "waiting time" can never constitute compensable work time under the FLSA.  *Id.* at 140.

In *Birdwell v. City of Gadsden, Alabama*, 970 F.2d 802 (11th Cir. 1992), the Eleventh Circuit applied the principles set out in *Skidmore* and *Armour*.  City detectives were placed on standby to report to duty during a one-week strike by other city employees.  *Id.* at 804.  The detectives were required to provide a telephone number where they could be reached "immediately" or to purchase and wear a pager, and were to remain "prepared to report for duty, in uniform, immediately."  *Id.* at 804 & 807.  The activities of the detectives who did not own pagers were restricted.  As noted by the court, these detectives "could not participate

_____

[10] Because there is no bright-line rule and facts are paramount, the cases in this opinion are discussed in some detail for purposes of comparison.

[11] This statement by the *Skidmore* Court does not mean that the question of whether on-call time is compensable under the FLSA cannot be decided on summary judgment.  "[T]he [*Skidmore*] Court could not have meant . . . 'that the *same* set of facts may lead to different results, but rather [meant] that the different facts of discrete cases may produce different results.'"  *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 808 (11th Cir. 1992) (quoting *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 675 (5th Cir. 1991) (*en banc*)).  "Certain sets of facts, if found by a fact finder, will give rise to liability under the FLSA while other sets of facts will not.  It is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist."  *Id.*

in outdoor activities such as fishing or hunting." *Id.* at 808.  For all on-call detectives,
drinking alcoholic beverages, leaving town, and taking a vacation were prohibited during the
one-week strike. *Id.*  Also, outings with family members required two vehicles "since the
detective could have been called away at any moment." *Id.*

The issue in *Birdwell* was whether the FLSA required that the detectives be
compensated for the time during which they could have been called to work.  970 F.2d
at 807.  "When employees are engaged to wait for the employer's call to duty, this time may
be compensable under the FLSA." *Id.* (citing *Skidmore*, 323 U.S. at 136).  "The question of
whether the employees are working during this time for purposes of the FLSA depends on
the degree to which the employee may use the time for personal activities." *Id.* (citing
*Skidmore*, 323 U.S. at 136).  "This question has been formulated as whether 'the time is spent
predominately for the employer's benefit or for the employee's.'" *Id.* (quoting *Armour*, 323
U.S. at 133).  Applying *Skidmore*, the Eleventh Circuit held that "whether on-call time is
covered by the FLSA" requires consideration of "'the agreements between the particular
parties, appraisal of their practical construction of the working agreement by conduct,
consideration of the nature of the service, and its relation to the waiting time, and all of the
surrounding circumstances.'" *Id.* at 808 (quoting *Skidmore*, 323 U.S. at 137).  Reviewing
relevant authority – from the Supreme Court and the Fifth and Tenth Circuits – the *Birdwell*
court concluded that "an employee's free time must be severely restricted for off-time to be
construed as work time for purposes of the FLSA." *Id.* at 810.

In *Birdwell*, the restrictions placed on the on-call detectives during the one-week strike were not severe:  "They could do anything they normally did so long as they were able to respond to a call promptly and sober."  970 F.2d at 810.  Also relevant was the fact that no detective had been called during the one-week strike period.  *Id.*  The detectives' "on-call time was not used predominantly for the employer's benefit," *id.* at 808, and, thus, the "detectives were not working during this period," *id.* at 810.

One of the Fifth Circuit cases cited with approval in *Birdwell* was *Bright v. Houston Northwest Medical Center Survivor, Inc.*, 934 F.2d 671 (5th Cir. 1991) (*en banc*).  In *Bright*, during an eleven-month period, the senior repair technician for the defendant-hospital had to wear a pager during all of his off-duty time (with no time off or vacation) and report to the hospital unimpaired within "approximately" twenty minutes of answering a page.  *See* 934 F.2d at 673.  While on call, the technician watched television at home, dined at restaurants and shopped.  *Id.*  He was called in, on average, four to five times during a seven-day period.  *Id.* at 674.  The technician brought an FLSA action, seeking overtime compensation for the hours he was "on call, but uncalled on."  *Id.*  The Fifth Circuit described the "'critical issue'" as "'whether the employee can use the [on-call] time effectively for his or her own purposes.'"  *Id.* at 677 (quoting *Halferty v. Pulse Drug Co., Inc.*, 864 F.2d 1185, 1189 (5th Cir. 1989)).  However, "[t]his does not imply that the employee must have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject."  *Id.*

17

Although acknowledging that the technician's on-call status "made his job highly undesirable and arguably somewhat oppressive," *id.* at 678, the *Bright* court held that the on-call time was not FLSA working time, *id.* at 675 ("[T]he FLSA's overtime provisions are more narrowly focused than being simply directed at requiring extra compensation for oppressive or confining conditions of employment."). The technician "was not restricted to any one or a few fixed locations, but could go virtually anywhere within approximately twenty minutes of the hospital." *Id.* at 678. Within that temporal radius, "anything was permissible, except excessive alcohol consumption." *Id.* The *Bright* court noted that it and other courts have "determined that considerably more restrictive on-call status did not result in work time." *Id.* at 675 (collecting cases).

In addition to interpretive case law, the United States Department of Labor ("DOL") has promulgated regulations for determining whether on-call time is compensable under the FLSA. *See Falken v. Glynn Cnty., Ga.*, 197 F.3d 1341, 1346 (11th Cir. 1999) ("[T]he DOL's regulations implementing the FLSA are accorded *Chevron* deference."). The regulations at 29 C.F.R. §§ 785.14-17 amplify *Skidmore*'s waiting to be engaged doctrine. Two circuits have emphasized that § 785.15 plainly provides that employee compensation for idle time is allowed only when "'the employee is unable to use the time effectively for his own purposes.'" *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992); *accord Halferty*, 864 F.2d at 1189. Section 785.17, relied upon by Plaintiffs, further provides:

> An employee who is required to remain on call on the employer's premises or
> so close thereto that he cannot use the time effectively for his own purposes is
> working while "on call".  An employee who is not required to remain on the
> employer's premises but is merely required to leave word at his home or with
> company officials where he may be reached is not working while on call.

*Id.* (citing, among other cases, *Armour*, 323 U.S. at 126).  Additionally, 29 C.F.R.

§ 553.221(d), relied upon by GenPak, provides:

> An employee who is not required to remain on the employer's premises but is
> merely required to leave word at home or with company officials where he or
> she may be reached is not working while on call.  Time spent at home on call
> may or may not be compensable depending on whether the restrictions placed
> on the employee preclude using the time for personal pursuits.  Where, for
> example, a firefighter has returned home after the shift, with the understanding
> that he or she is expected to return to work in the event of an emergency in the
> night, such time spent at home is normally not compensable.  On the other
> hand, where the conditions placed on the employee's activities are so
> restrictive that the employee cannot use the time effectively for personal
> pursuits, such time spent on call is compensable.

Analyzing *Skidmore*, *Bright*, *Halferty* and other decisions, the Ninth Circuit in *Owens*

determined that whether on-call "waiting time" is compensable work under the FLSA

depends upon "two predominant factors":  "(1) the degree to which the employee is free to

engage in personal activities; and (2) the agreements between the parties."  971 F.2d at 350

(internal footnotes omitted); *accord Lurvey v. Metro. Dade Cnty.*, 870 F. Supp. 1570, 1576

(S.D. Fla. 1994); *LaPorte v. Gen. Elec. Plastics*, 838 F. Supp. 549, 554 (M.D. Ala. 1993).

As to the first factor, the Ninth Circuit observed that

> [c]ourts have considered a number of factors in determining whether an
> employee plaintiff had use of on-call time for personal purposes:  (1) whether
> there was an on-premises living requirement; (2) whether there were excessive
> geographical restrictions on employee's movements; (3) whether the frequency
> of calls was unduly restrictive; (4) whether a fixed time limit for response was

unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.  Such a list is illustrative, not exhaustive.  No one factor is dispositive.

*Owens*, 971 F.2d at 351 (internal footnotes omitted).

With respect to agreements, the Eleventh Circuit in *Birdwell*, like the Ninth Circuit in *Owens*, specifically incorporated into the analysis an inquiry into whether an agreement existed between the parties concerning the on-call procedure.  *See Birdwell*, 970 F.2d at 808 ("[W]hether on-call time is covered by the FLSA" and, thus, compensable requires consideration of "'the agreements between the particular parties [and] appraisal of their practical construction of the working agreement by conduct.'" (quoting *Skidmore*, 323 U.S. at 137)).  "An agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work."  *Berry v. Cnty. of Sonoma*, 30 F.3d 1174, 1181 (9th Cir. 1994).  "Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work."  *Id.*; *see also Owens*, 971 F.2d at 354 ("Although the existence of an agreement may not be controlling in all cases, it is usually relevant to the compensability issue." (citation and internal quotation marks omitted)).

Not only are the express terms of any actual on-call agreement important, but also significant is the parties' practical construction of that agreement, as exhibited by their conduct.  *See Lurvey*, 870 F. Supp. at 1582 ("[T]he Eleventh Circuit requires this Court to

20

examine the actual agreements between the parties and to construe the agreement giving recognition to a 'working agreement by conduct.'" (quoting *Birdwell*, 970 F.2d at 808)). Hence, agreements can be express or can be formed constructively when an employee is informed of an on-call policy and continues to work on-call assignments under the policy's terms. *See Owens*, 971 F.2d at 355.

### A.  The Ability to Engage in Personal Activities While On Call

*Owens*'s seven-factor formulation provides a useful guide for isolating the facts relevant to the determination of whether Plaintiffs have the ability to engage in personal activities while on call.[12]  For the reasons to follow, having considered all of the circumstances, the court finds that while Plaintiffs are on call, they are not working, but are using the time primarily for their own benefit.

First, unlike the firefighters in *Armour* and *Skidmore*, Plaintiffs do not have to remain on GenPak's premises or within hailing distance while on call and awaiting a possible page and need for their services.  Indeed, Plaintiffs are not required to remain at any particular location assigned by GenPak.  The fact that GenPak does not have an onsite living requirement for its on-call Class A Maintenance employees readily distinguishes this case from *Armour* and *Skidmore*.  *See* § 553.221(d) ("An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.").

---

[12] Although the Eleventh Circuit has not passed on *Owens*'s seven factor test, above, *Birdwell*'s focus is consistent with *Owens*.  Also, the parties' analysis, in particular GenPak's, includes specific discussion of these factors.

Second, as to geographical restrictions imposed by the required response times, Plaintiffs can enjoy the comforts of home, or can venture outside their homes to engage in a range of personal activities, so long as they respond to a page within an hour, and report to work, if necessary, within an hour and a half of being paged.   Compared with other cases, the hour call back and the hour-and-a-half response time do not appear particularly onerous, as shorter response times have been found not to restrain an employee's ability to engage in personal activities.   In *Birdwell*, for example, the on-call detectives had to respond to a call immediately and had to be prepared to report to work in uniform "immediately."  970 F.2d at 804, 807.  The technician in *Bright* had to remain in a geographical area that would permit him to report to work within approximately twenty minutes of being called.  *See* 934 F.2d at 676.  And, in the following cases, idle on-call time was predominantly for the employee's benefit, notwithstanding response times significantly less than those imposed upon Plaintiffs. *See Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 724 (8th Cir. 2001) (twenty minutes); *Andrews v. Town of Skiatook, Okla.*, 123 F.3d 1327, 1330 (10th Cir. 1997) (five to ten minutes); *Norton v. Worthen Van Serv., Inc.*, 839 F.2d 653, 654 (10th Cir. 1988) (fifteen to twenty minutes).

Third, Plaintiffs have flexibility in their on-call schedules.   They can obtain permission from Mr. Hughes to trade on-call duties with other employees.   Indeed, Mr. Malone has done so on more than one occasion.   While on one occasion he was denied such a request, Mr. Malone does not refute Mr. Hughes's attestation that the denial was unrelated to his job performance.   Nor does Mr. Malone provide evidence that trading shifts was

22

otherwise difficult.  Additionally, although Mr. Taunton opted not to trade shifts, there is no evidence that he could not have readily obtained approval to do so.  *See Berry*, 30 F.3d at 1184 (The fact that coroners "seldom voluntarily traded on-call shifts" out of reluctance to impose upon their colleagues bore little relevance to the inquiry of "whether the on-call employee [could] *easily* trade on-call responsibilities."); *see also Lurvey*, 870 F. Supp. at 1581 (When employees are able to trade on call time, "curtailment of personal activities may be somewhat alleviated.").  Further flexibility is demonstrated by the fact that an employee is not precluded from scheduling a vacation during his on-call week; if that occurs, the rotation simply skips to the next employee on the list.  Finally, the GenPak-issued pager frees Plaintiffs from literally having to sit by a telephone.

Fourth, there is a low incidence of on-call activity.  On average, at the time this lawsuit was filed, Plaintiffs served on call ten-and-a-half weeks a year.  (Hughes Aff. ¶ 3.) Over a three-year span (2007 to 2009) while on call, Mr. Taunton only was required to report to the plant an average of ten times a year (or once during each week-long, on-call rotation) and only worked an average of 1.21 hours when called in.  Mr. Malone – who on average was called in five-and-a-half times a year (or once every other on-call rotation) – performed an average of 2.05 hours of work each time he clocked in while on call.  Only three of the call-in duties for Mr. Taunton and for Mr. Malone required more than four hours of work, and none of the call-in work exceeded five and a half hours.  The frequency of call ins for Plaintiffs is less than in other cases where the on-call time was not compensable.  *See Gilligan v. City of Emporia*, 986 F.2d 410, 412 (10th Cir. 1993) (Employees called back to

duty on average less than one time per day); *Burnison v. Mem'l Hosp., Inc.*, 820 F. Supp. 549, 552 (D. Kan. 1993) (Emergency medical technicians required to respond "to between 1.1 and 1.4 calls every four days").  Here, the limited call-in activities give Plaintiffs sufficient time to engage in personal activities during periods of idleness between assignments; the call ins are not unduly restrictive.

Fifth, and relatedly, Plaintiffs obtain periodic relief from their on-call status, as they only serve on call every fourth or fifth week, unlike the *Bright* technician who was on call 24/7, and had not had a vacation in eleven months, *see* 934 F.2d at 673.  During those weeks when Plaintiffs are not on call, they have no restrictions on their personal activities.

Sixth, Plaintiffs admit that they can engage in a variety of personal activities, both at and away from home, from watching television and entertaining guests to grocery shopping and eating out.  In *Halferty*, where the plaintiff worked from home at night as a telephone dispatcher for a nonemergency ambulance care provider, similar evidence established that she "could use the time for her own purposes" and was not "entitled to [FLSA] compensation for her idle time."  846 F.2d at 1189.  Namely, the plaintiff "could visit friends, entertain guests, sleep, watch television, do laundry, and babysit."  *Id.*; *see also Bright*, 934 F.2d at 673 (Technician was able to use his on-call hours for his own purposes; he "not only stayed at home and watched television and the like, but also engaged in other activities away from home, including his 'normal shopping' (including supermarket and mall shopping) and 'occasionally' going to restaurants to eat.").

Notwithstanding the foregoing evidence, Mr. Taunton contends that he is unduly restricted while on call because he quit fishing during his on-call rotation and cannot take medication while on call for fear that he will not wake up if paged.  There is no evidence, however, that GenPak prohibited him from fishing or that the on-call response times – up to an hour to return a page and up to an hour and a half to reach the plant – precluded him from doing so.  Rather, Mr. Taunton merely says, without explanation, that he "stopped" fishing while on call.  (Taunton Dep. 116.)  This apparent unilateral decision to cease fishing while on call neither changes the fact that he has fished while on call nor establishes that he could not have continued to fish when on call.  Evidence of the circumstances surrounding Mr. Taunton's taking of medication is sparse.  (Taunton Dep. 67.)  Notably, however, there is no evidence that he was told that he could not take medication or that he would have been precluded from switching call times to alleviate his fears of sleeping through a page.

Like Mr. Taunton, Mr. Malone also apparently refrains from engaging in activities that could be cut short by a page, but as in *LaPorte*, "nothing inherent in [GenPak's] work practice requires such a limitation."  838 F. Supp. at 556.  Additionally, unlike the plaintiffs in *Birdwell* and *Bright*, on-call employees are not required to abstain completely from alcohol use, although in Mr. Malone's case (*see* Malone Dep. 61), it might be advisable that he do so.

Some interference obviously occurs in Plaintiffs' pursuit of certain personal activities during the weeks they are on call.  The on-call restrictions, however, are not so restrictive

that a jury reasonably could conclude that the time was spent predominantly for the employer.

Plaintiffs, however, argue that, on those occasions when a GenPak supervisor paged them but ultimately determined that they need not come to plant, GenPak benefitted from their mechanical advice, at their expense.[13] (Pls. Summ. J. Resp. 2.) A similar argument was made in *Owens*. The mechanics argued that their employer, "not the mechanics, benefitted from the on-call policy." 971 F.2d at 354. The Ninth Circuit observed that the mechanics had "misstate[d] the test." *Id.* The same holds true in this case: "The test is not the importance of on-call work to the employer, rather the test is focused on the employee and whether he is so restricted during on-call hours as to be effectively engaged to wait." *Id.* Moreover, under this test, Plaintiffs' argument that they have been unfairly disciplined for violating the on-call policy – specifically, the written one-hour call-back rule and the unwritten one-and-a-half hour reporting rule – is "irrelevant because [it is] unrelated to whether an employee can use [on-call] time for personal pursuits." *Id.*

In sum, all of the circumstances of this case weigh in favor of GenPak. As a matter of law, the court finds that Plaintiffs' on-call waiting time is spent predominantly for the employee's benefit. *See Armour*, 323 U.S. at 133. In other words, they are "wait[ing] to be engaged," rather than "engaged to wait." *Skidmore*, 323 U.S. at 137.

---

[13] Plaintiffs' argument rings hollow for lack of an evidentiary foundation. Plaintiffs have not pointed to any evidence, and the court has found none, regarding how often Plaintiffs were paged without having to report to the plant. There is only a general statement from Mr. Hughes that, "[a]fter contact is made" with the on-call employee, "there is further discussion to determine whether the on call employee will actually need to report to the plant." (Hudson Aff. ¶ 6.) Plaintiffs also have not provided any evidence as to the nature of the telephone conversations that prompted GenPak to decide that they did not need to report to work.

### B.     **Agreement Between the Parties**

The parties devote little discussion to the agreement between them concerning the on-call policy.  As in *Owens*, however, it is clear that Plaintiffs do not like the conditions imposed upon them by GenPak's on-call policy.  *See* 971 F.2d at 355.  In particular, they complain that the one-hour call-in rule and the one-and-a-half hour reporting rule require them to put their lives "on hold."  (Taunton Dep. 65.)   While Plaintiffs contend that the on-call policy changed for the worse at some point while working at the Hope Hull plant (Malone Dep. 16, 18; Taunton Dep. 35-38), it is undisputed that they knew the terms of the new on-call policy and have continued to work at GenPak and participate in the on-call assignments (Taunton Dep. 69-70).   They, thus, have demonstrated their constructive acceptance of the terms of the on-call policy by their continued employment with GenPak. *See Owens*, 971 F.2d at 355.

Moreover, the written Call In Policy provides for overtime compensation for actual work performed at the plant on a call in, and this method of payment was known to and accepted by Plaintiffs.  From these facts, an agreement existed with respect to compensation of on-call time, principally as demonstrated by the conduct of the parties, and the agreement is that Plaintiffs receive compensation only for actual call-in work, not for on-call waiting time.  This agreement "suggest[s] [that] the parties do not characterize waiting time as work." *Berry*, 30 F.3d at 1181.

### C.     **Summary**

The factors for determining whether on-call waiting time is compensable under § 207(a)(1) weigh overwhelmingly in favor of GenPak. The evidence demonstrates that Plaintiffs are able to use their on-call time for their own benefit. GenPak's on-call policy is less restrictive than in any of the cases cited. Plaintiffs are on call for one week every four or five weeks. They are able to trade their on-call rotations. The call ins are infrequent. They are not required to remain on GenPak's premises, or even at home, given that GenPak issues them pagers. They are free to go about their personal lives as they wish, provided that they answer a page within an hour and remain ready to report to the plant in an hour and a half. Case law establishes that these response times are generous. And, Plaintiffs in fact did pursue personal activities during their on-call time. The on-call duty interferes only minimally with Plaintiffs' normal personal pursuits around and outside their homes; their free time is not "severely restricted." *Birdwell*, 970 F.2d at 810. Moreover, Plaintiffs' knowledge of the terms of the on-call policy implemented during their tenure at GenPak and their continued employment at GenPak evidence their agreement to GenPak's overtime compensation policy for on-call rotations. Accordingly, the on-call time that Plaintiffs spend on standby is not compensable overtime pursuant to § 207(a)(1).

## VI. CONCLUSION

The facts, construed in the light most favorable to Plaintiffs, establish as a matter of law that Plaintiffs are not entitled to overtime compensation under 29 U.S.C. § 207(a)(1) for the portion of their on-call time when they are not actually working at the plant.

Accordingly, it is ORDERED that Genpak's Motion for Summary Judgment (Doc. # 19) is

GRANTED.

A separate judgment will be entered.

DONE this 30th day of July, 2010.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE